UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 16-214 |
| VERSUS | * | SECTION: "R" |
| JOBIE CREAR, M.D. | * | |

\* \* \*

## FACTUAL BASIS

1.  If this matter were to proceed to trial, the United States would introduce the following facts with relevant and admissible testimony and exhibits to support Count 1 of the Bill of Information, a violation of Title 18, United States Code, Section 371 (conspiracy to pay and receive illegal kickbacks in violation of 42 U.S.C. §1320a-7b(b)(1) and 1320a-7b(b)(2).[1]

2.  Wendy Naquin from AdvanceMed, the Zone Program Integrity Contractor (ZPIC) over home health claims in this state, would testify that during all times mentioned in the indictment, Comprehensive Nursing and Home Health Service, Inc. (Comprehensive) was enrolled as a provider able to bill Medicare for providing home health services to qualified beneficiaries.

3.  Different documentation would establish that **CREAR** was the owner, operator, and Chief Operating Officer of Comprehensive. Albert Junius and Amos Johnson would each testify about how they posed as the owners of Comprehensive pursuant to instructions from **CREAR**. Johnson would testify that he was the operator of his own lawn service and Junius would testify that he worked at Walmart. Both would testify that they had no actual ownership

---

[1] This proffer of evidence is not intended to constitute a complete statement of facts known to the United States. The limited purpose of this factual basis is to demonstrate a sufficient legal basis for the defendant's guilty plea to the charged offense.

of Comprehensive. Other employees of Comprehensive would testify that **CREAR** did not want to appear to be the owner of Comprehensive because, as the physician owner and operator of an ophthalmology practice, he could not make referrals to Comprehensive under Medicare regulation if he was the owner of Comprehensive.

4. Many employees from Comprehensive would testify that **CREAR** was the true owner of Comprehensive and that they all took their instruction and orders from **CREAR.**

5. Whomever **CREAR** deemed responsible for applying for and maintaining Comprehensive's Medicare provider enrollment was required to repeatedly provide truthful Medicare enrollment applications on behalf of Comprehensive. Each of the successive Medicare provider enrollment applications dating back to at least 2009 would be introduced into evidence. Each application included the certification at No. 15:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare…I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

6. MoBr would testify that she was employed at Comprehensive from 2009 through December 2013. MoBr would testify that Comprehensive routinely paid non-employee recruiters and Comprehensive employees, including nurses and maintenance staff, kickbacks for referring Medicare beneficiares for home health services. Kickback checks to recruiters who were not Comprehensive employees usually had the words "patient education," "patient instruction," and often the patient's name in the memo line of the checks. MoBr would testify that these phrases were code words for referral fees to the recruiters.

PHS
JRW/NEB:
JC:

7. MoBr would testify about a specific recruiter for Comprehensive – "SaGr" – who was paid approximately $44,132 in about 62 checks between February 2009 and November 2013 for information on Medicare beneficiaries she provided to Comprehensive. MoBr would describe the checks as detailed above and explain that the checks were almost always in increments of $500.

8. ReWo was a Comprehensive Administrator from 1996 through 2011. ReWo would testify that home health agencies are not supposed to pay for patients even though ReWo admitted she was paid a patient referral fee. Comprehensive employees needed **CREAR'S** permission to pay someone a referral fee. ReWo would testify that at a Comprehensive staff meeting **CREAR** explained how he would offer incentives for office staff if they brought patients to Comprehensive. Employees had to identify the patient to **CREAR** when they sought payment for an individual referral fee. ReWo would testify about a specific recruiter – "VeWi" – to whom **CREAR** directed ReWo to write Comprehensive Check No. 5531. The memo line had the word "referrals." All checks written from Comprehensive to recruiter VeWi between about March 11, 2010, and April 1, 2010, totaling approximately $9,300, representing kickbacks paid by Comprehensive for the providing of Medicare beneficiary information, would be entered into evidence.

9. ReWo would testify about eight (8) checks written between about June 2011, and December 2011, payable to patient recruiter SaPa, most in the amount of $400 and $800, with "educational instruction" and the patient names written in the memo lines. ReWo would testify that these checks were in return for SaPa's delivery of Medicare beneficiary information to Comprehensive.

10. ReWo and another Administrator, ErJo, would testify about seven (7) checks written between October 2010, and December 2011, written to another recruiter, "PhBa." The

PHS
JRW/NEB
JC

checks were written in amounts ranging from $300 and $800, contained the words "educational instruction" along with patient names written in the memo lines, and represented kickbacks paid by Comprehensive to PhBa for receipt of Medicare beneficiary information.

11. Regarding the checks referenced herein, Federal Bureau of Investigation Special Agent Krista Bradford would testify about an analysis she made of the patient names listed in the checks and AdvanceMed Medicare data detailing Comprehensive's billing. Agent Bradford would testify about the billing that corresponded to each kickback made to the above referenced recruiters, all of whom were admitted by Comprehensive to home health after their referral.

DUANE A. EVANS
ACTING UNITED STATES ATTORNEY

_____
PATRICE HARRIS SULLIVAN
ASSISTANT UNITED STATES ATTORNEY
Louisiana Bar No. 14987

_____
JASON ROGERS WILLIAMS
NICOLE E. BURDETTE
COUNSEL FOR DEFENDANT
DATE: 3/30/2017 / 4/7/2017

_____
JOBIE CREAR, M.D.
DEFENDANT
DATE: 3/30/17

PHS
JRW/NEB
JC: